UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Mark S. Wallach,

        Appellant,

        v.

David Smith & Jennifer Smith,

        Appellees.

DECISION AND ORDER
15-CV-1080(LJV)

## **INTRODUCTION**

In an adversary proceeding brought by Trustee Mark S. Wallach ("Trustee" or "Wallach"), the Bankruptcy Court granted summary judgment to the defendants, David and Jennifer Smith. At stake in this appeal is $700,000 (plus interest)—the balance remaining on a stock-subscription agreement signed in March 2009, 16 months before NanoDynamics, Inc., the debtor corporation, filed for bankruptcy. Because 11 U.S.C. § 356(c)(2) precludes the bankruptcy trustee from assuming "any executory contract . . . to issue a security of the debtor," this Court AFFIRMS the decision of the Bankruptcy Court.[1]

## **FACTUAL BACKGROUND**

On several occasions, David and Jennifer Smith invested sizeable sums in the technology industry. One beneficiary of those investments was the debtor here, NanoDynamics, Inc., a company engaged in research and development of such commercial applications as cement additives, nano-metal particles, and water-filtration

---

[1] Because resolving this issue disposes of the case, this Court does not reach the other question presented: Whether the debtor corporation's allegedly incomplete disclosures violated federal securities laws and thus invalidated the stock-subscription agreement signed by the defendants in the wake of those omissions.

and halloysite products.  NanoDynamics sought and received multiple investments from the Smiths—in 2004, 2005, and 2007—at different prices per share.

In October 2008, NanoDynamics again looked to the Smiths for capital.  As it had in the past, NanoDynamics provided the Smiths with a Confidential Private Placement Memorandum ("PPM"), this one offering shares of stock for $5 per share.  The PPM apprised prospective investors of the company's financial condition and stated that the "business is dependent upon the proceeds of this Offering to fund our existing obligations and continuing operations."  Docket Item 4-22 at 16.[2]

A short time later, the Smiths invited NanoDynamics representatives to meet with them and other potential investors.  Mr. Smith maintains that during this meeting, he privately asked Keith Blakely, then-CEO of NanoDynamics, whether an investment of $2.5 million would be sufficient to take the debtor through to an initial public offering ("IPO").  According to Mr. Smith, Blakely said that it would.

At about the same time, NanoDynamics was struggling to remain solvent.  In fact, the corporation's officers contemplated filing for bankruptcy, and they met with professionals to discuss that possibility.  The Smiths were not explicitly informed about that before they signed the contract giving rise to the current dispute.  They did, however, receive a First Addendum to the PPM ("First Addendum") in December 2008.  The First Addendum addressed the corporation's increased risk of insolvency, stating that NanoDynamics "is overdue in its payment to most vendors" and that "[t]he funds to

---

[2] There are three different dockets associated with this matter: the bankruptcy proceeding (9-BK-13438), the adversary proceeding (11-AP-1002), and the bankruptcy appeal in this Court (15-CV-1080).  Any submissions docketed in the bankruptcy proceeding or adversary proceeding are so designated; otherwise, the docket citations refer to this Court's docket.

be raised in this Offering are required if the Company is to continue as a going concern."

On March 9, 2009, the Smiths and NanoDynamics signed a stock-subscription agreement ("Agreement") in which the Smiths agreed to purchase 2.5 million shares in NanoDynamics for $1 per share.  The first $500,000 of the subscription price was to be paid upon the Agreement's execution, and the remaining $2 million balance was to be paid by March 31, 2009.  NanoDynamics agreed to issue the corresponding stock certificates for the purchased shares within five business days of each payment received.

The parties did not strictly comply with the dates in the Agreement.  Instead, the Smiths invested the initial $500,000 by April 1, 2009, and they invested an additional $1.3 million over the next few months: $1 million on April 10; $200,000 on April 20; and $100,000 on June 8.  Within five days of each of these payments, and as provided in the Agreement, NanoDynamics issued the corresponding certificates of stock to the Smiths.

On July 27, 2009, having received $1.8 million of the $2.5 million that the Smiths agreed to pay, NanoDynamics filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code.  BK Docket Item 1.

## **PROCEDURAL BACKGROUND**

After the declaration of bankruptcy, Wallach was appointed trustee, and the debtor filed its schedule of assets.  The debtor's schedule included the $700,000 balance still owing from the Smiths, and the Trustee moved, pursuant to 11 U.S.C.

§ 365(a), to assume "an unexpired executory contract"—namely, the Agreement.  BK Docket Item 109.

In February 2011, Wallach filed an amended complaint, alleging that the Smiths were liable under the Agreement and N.Y. Bus. Corp. Law § 628(a); were liable for breach of contract; and owed $700,000 to the bankruptcy estate under 11 U.S.C. § 542.  Docket Item 3-8 at 2-3.  In response, the Smiths moved to dismiss, AP Docket Items 5, 7, 10, a motion that the Bankruptcy Court denied in May 2011, AP Docket Item 19.  About three years later, in March 2014, the defendants filed what would be their final amended answer, raising several affirmative defenses and counterclaims.  *See* Docket Item 3-3.  Both sides moved for summary judgment—on March 4, 2014 (Docket Item 4-15), and March 7, 2014 (Docket Item 4-16), respectively—and all responses and replies were filed by August 1, 2014.

After reviewing the submissions and hearing oral argument, and after issuing an interlocutory decision on the dueling motions, Docket Item 1-2, United States Bankruptcy Judge Michael J. Kaplan granted the defendants' motion for summary judgment and dismissed the complaint in its entirety.  Docket Item 1-4.  The plaintiffs filed a notice of appeal from the Bankruptcy Court's decisions on December 22, 2015.  Docket Item 1.  The plaintiff filed its brief in February 2016 (Docket Item 6); the defendants responded in March 2016 (Docket Item 8); and the plaintiff replied in April 2016 (Docket Item 9).  This Court held oral argument in February 2017 and reserved decision.  Docket Item 16.

## LEGAL STANDARDS

### A. Jurisdiction and Standard of Review on Bankruptcy Appeal

United States district courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158(a). Pursuant to this jurisdiction, a district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The district court must accept a bankruptcy court's findings of fact unless they are clearly erroneous, *id.*, but it reviews the bankruptcy court's legal conclusions de novo. *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006).

### B. Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant—i.e., the party seeking summary judgment—has the initial burden of showing that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It may satisfy this burden by relying on evidence in the record, "including depositions, documents, . . . [and] affidavits," Fed. R. Civ. P. 56(c)(1)(A), or by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *see* Fed. R. Civ. P. 56(c)(1)(B). Once the movant has satisfied its initial burden, "the nonmoving party must come forward with specific facts" showing that there is a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). If the nonmovant fails to

carry this burden, the court may grant summary judgment.  *See Celotex Corp.*, 477 U.S. at 323.

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "[T]he court must view the evidence in the record in the light most favorable to the non-moving party" and must draw "all reasonable inferences in that party's favor." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  But "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996).

Although each party here moved for summary judgment, that does not change the standard: "cross-motions are no more than a claim by each side that it alone is entitled to summary judgment." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103 (2d Cir. 2010) (quoting *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 838 (2d Cir. 1994)).

## **DISCUSSION**

The parties contest whether the stock-subscription agreement was an executory contract when NanoDynamics filed its bankruptcy petition.[4]  The plaintiff argues that the defendants are liable for a simple pre-petition breach of the Agreement and that the

---

[4] The parties do not seem to dispute that the Agreement was an executory contract at the time of its execution.  Indeed, the Trustee argues that the Smiths' failure to honor their obligation to pay the $2.5 million that they agreed to pay by March 31, 2009, was a material breach relieving NanoDynamics of its executory obligation to issue the corresponding stock certificates.

6

defendants owe damages: the $700,000 balance plus interest. The defendants counter that the Trustee would be required to issue the corresponding 700,000 stock shares in exchange for this payment, making the contract executory and therefore unenforceable under 11 U.S.C. § 365(c)(2).

Section 365(c)(2) provides:

> *The trustee may not assume* or assign *any executory contract* or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if . . . such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or *to issue a security of the debtor* . . . ."

*Id.* (emphasis added). According to the Smiths, because the Agreement is an executory contract requiring NanoDynamics to issue securities in exchange for payment, the Trustee cannot assume the contract under § 365(c)(2). As for the Trustee's "pre-petition breach" argument, the Smiths respond that the Agreement remained executory for purposes of § 365 after the bankruptcy filing because the debtor continued performance long after the "alleged March 31, 2009 breach." Docket Item 5 at 44-45. The Trustee replies that § 365 is inapplicable "because the undisputed facts demonstrate that [d]efendants materially breached the Subscription Agreement by failing to pay the balance due under the Subscription Agreement on or before March 31, 2009, thereby excusing performance by the Debtor in the form of stock issuance." Docket Item 4-15 at 45 (citation omitted).

Judge Kaplan concluded that § 365(c)(2) precluded the Trustee from assuming the Agreement and issuing the shares:

> In the generality of cases involving rejected executory contracts, the fact of rejection does not mean that a debtor in possession or trustee may not sue upon the instrument. . . . The case at bar is different. What remains of the matter in dispute is, for all intents and purposes, a simple purchase and sale contract—

7

$700,000 to be paid for 700,000 shares of the Debtor's common stock. 11 U.S.C. § 365(c)(2) is a statutory bar to issuing such stock, thereby rendering the balance of the Agreement "impossible of performance."

Docket Item 6-3 at 5.

The question is whether or not the Agreement was an executory contract at the time of the bankruptcy petition; if it was, then § 365 bars the Trustee from assuming the obligation "to issue a security of the debtor." On the other hand, if the Smiths simply are liable to the debtor for damages resulting from a pre-petition breach, then § 365 does not apply and the Trustee may successfully seek $700,000 in damages for the unpaid balance of the Agreement.

A contract is executory when "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973).[5] Whether a breach is material is a factual question that a court decides under state law. *Seitz*, 2009 WL, at *2. Under New York law, "a material breach is one which substantially defeats the purpose of the contract, and if uncured, will operate to excuse the other party from further performance." *Id.* (citing *In re Lavigne,* 114 F.3d 379, 386-387 (2d Cir. 1997)). In other words, a material breach is one that "goes to the root of the contract." *In re Lavigne*, 114 F.3d at 387 (quotation omitted).

---

[5] The Bankruptcy Code does not define the term "executory contract," and the Second Circuit has not addressed which of the three definitional approaches is controlling. *Seitz v. Paul T. Freund Corp.*, 2009 WL 1011617, at *2 (W.D.N.Y. Apr. 15, 2009) (quoting *In re Riodizio, Inc.*, 204 B.R. 417, 421-25 (Bankr. S.D.N.Y. 1997) (discussing the Countryman test, the "some performance due" test, and the "functional" approach). This Court applies the Countryman test—the most rigorous standard. *See, e.g.*, *Seitz*, 2009 WL, at *2. But regardless of which test applies, the contract at issue here is executory.

"It is axiomatic that one party's material breach excuses the other party's obligation to further perform." *Kraatz v. USAA Casualty Ins. Co.*, 2017 WL 876187, at *11 (W.D.N.Y. Mar. 6, 2017). Here, there can be little doubt that either side's breach of its only real obligation in the Agreement would be a material breach excusing the other side from performing. Indeed, the Agreement called for nothing more than money from the Smiths and corresponding shares of stock from NanoDynamics. Either side's breach of those obligations clearly would be material.

But that does not end the matter. The Trustee argues that the Smiths' failure to live up to their part of the bargain by investing the full $2.5 million under the Agreement made their breach a *fait accompli* on April 1, 2009—long before NanoDynamics declared bankruptcy. That breach, Wallach argues, not only relieved NanoDynamics of any obligation to provide the shares in question, but it also constituted a complete material breach on which NanoDynamics could have sued prior to declaring bankruptcy. So the contract is not "executory," Wallach concludes; rather, the Trustee is simply looking to collect "damages" for the continuing breach that began when the Smiths failed to invest the full $2.5 million they had agreed to invest by the dates they had agreed to invest it—March 9 and March 31, 2009.

Wallach's argument is misplaced. The fact that NanoDynamics could have sued for breach of contract—or perhaps proffered the shares at issue and sued for damages—does not change the nature of the contract from executory to non-executory. And what NanoDynamics did—not what it could have done—illustrates the point.

In New York, when a party has materially breached a contract, "the non-breaching party is discharged from performing any further obligations under the

contract, and . . . may elect to terminate the contract and sue for damages." *NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003). But a party's material breach does not necessarily make an executory contract non-executory: the non-breaching party must either choose to terminate the contract or "choose to continue performance." *Id.* (quoting *AM Cosmetics Inc. v. Solomon*, 67 F. Supp. 2d 312, 317 (S.D.N.Y. 1999)). In other words, "the power to terminate a continuing contract because of a particular breach of that contract is a power of election," and "[i]f the injured party chooses to go on, he loses his right to terminate the contract because of the default." *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969). So while declaring a breach and suing for damages might remove the executory elements of a contract (or at least render them inapplicable), continuing to abide by the contract's terms does not.

Here, when the Smiths did not pay the $2 million balance on March 31, 2009—when it was due—NanoDynamics chose to go on. It could have declared a material breach and demanded payment. It did not do that. It could have tendered the shares at issue, presumably removing its executory element of the contract. It did not do that. Instead, it chose to forebear taking action against the Smiths. And it did that for good reason: on April 10, 2009, April 20, 2009, and June 8, 2009, the Smiths paid another $1.8 million toward the $2.5 million they had agreed to invest. And since NanoDynamics declared bankruptcy just a little over a month after the Smiths made their last payment, NanoDynamics must have known by then that the Smiths were investing in a sinking ship.

Under similar circumstances and other § 365 subsections, courts have reached a similar conclusion that "a contract is not deemed terminated and no longer executory simply because the debtor has defaulted or breached the contract before the commencement of a bankruptcy case." *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 45 (S.D.N.Y. 1989) (citing *In re Alexander*, 670 F.2d 885, 887 (9th Cir. 1982)); *see also In re Spoverlook, LLC*, 551 B.R. 481, 485 (Bankr. D. N.M. 2016); *In re Kemeta, LLC*, 470 B.R. 304, 324-25 (Bankr. D. Del. 2012); *In re Nickels Pier, LLC*, 372 B.R. 218, 222–223 (D. N.J. 2007); *In re Aegina Invs., LLC*, 2008 WL 5076979, *4 (Bankr. D.D.C. 2008); *Bullet Jet Charter, Inc.*, 177 B.R. 593, 600 (Bankr. N.D. Ill. 1995); *In re Nemko, Inc.*, 163 B.R. 927, 939 (Bankr. E.D.N.Y. 1994); *accord In re Broadstripe, LLC*, 402 B.R. 646, 656 (Bankr. D. Del. 2009) (examining whether the contract was merely breached by the debtor pre-petition, or was validly terminated pre-petition under applicable state law). This Court chooses to follow those cases and that reasoning here, where NanoDynamics failed to capitalize on its chance to treat the Agreement as breached and terminated.

Of course, parties to a contract gone bad are entitled to mitigate their losses and should not be penalized for doing so. "[A] party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future." *Seven-Up Bottling Co. (Bangkok) v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) (citing *S.D. Hicks & Son Co. v. J.T. Baker Chem. Co.*, 307 F.2d 750 (2d Cir. 1962) ("[T]here is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the

11

due date and by urging and encouraging the other parties to perform thereunder.")); *Canda v. Wick*, 100 N.Y. 127, 2 N.E. 381 (1885) (a non-breaching party's unsuccessful efforts to persuade a party to perform do not equate to a waiver of the innocent party's right to sue on the breach)). But here it appears that NanoDynamics was not simply seeking to minimize its losses; rather, it was choosing to continue performance and to get the Smiths to invest every dime they would. Although the Smiths remained delinquent in their payments and therefore in breach of the contract, NanoDynamics's unwavering election to accept the defendants' payments and issue corresponding certificates of stock kept the contract in force as a continuing executory contract.

What is more, the debtor itself—in fact, the Trustee—considered the contract to be executory: the Trustee initially filed a motion to assume "an unexpired executory contract" pursuant to 11 U.S.C. § 365(a). *See* BK Docket Item 9 at 1. So even Wallach himself recognized the Agreement as an executory contract *after* the debtor declared bankruptcy, and *long after* the Smiths' breach.

NanoDynamics and the Trustee cannot have it both ways. They "cannot at the same time treat the contract as broken and subsisting, for [o]ne course of action excludes the other . . . and [t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (quoting *Apex Pool Equip. Corp.*, 419 F.2d at 562) (other citations and internal quotation marks omitted). Stated another way, if a party chooses to forgive a breach and continue performance, it cannot later reverse course and "terminate the contract on the basis of the earlier breach." *NAS Electronics, Inc.*, 262 F.

Supp. 2d at 145 (quoting *AM Cosmetics Inc. v. Solomon,* 67 F. Supp. 2d 312, 317 (S.D.N.Y. 1999)).

In sum, the Agreement between the Smiths and NanoDynamics was an executory contract to issue a security of the debtor in exchange for money from the Smiths. The Agreement remained executory at the time of the NanoDynamics Chapter 7 filing for bankruptcy. Because a trustee cannot assume an executory contract, *see* 11 U.S.C. § 365(c)(2), the Trustee cannot assume the Agreement here, and the contract's outstanding obligations are, in the words of the Bankrutpcy Court, "impossible of performance." As a result, the Agreement must be "deemed rejected." *See id.* § 365(d)(1).[6]

## **CONCLUSION**

Because 11 U.S.C. § 356(c)(2) precludes the Bankruptcy Trustee from assuming the executory agreement here, the Bankruptcy Court correctly granted summary judgment in favor of the Smiths. And because § 365(c)(2) decides the case, this Court need not consider whether the Agreement was invalid due to the debtor's violation of the federal securities laws.

For all these reasons, this Court AFFIRMS the Bankruptcy Court's 2015 decision granting the defendants' motion for summary judgment. The case is REMANDED to the

---

[6] This conclusion makes good sense in light of § 365's legislative history. Prior to the Bankruptcy Reform Act of 1978, some courts concluded that a bankruptcy trustee can collect on the unpaid portion of a stock subscription agreement. *See, e.g.*, *Allen v. Ryan*, 219 A.D. 634, 221 N.Y.S. 77 (4th Dep't 1927). But Congress enacted § 365(c)(2) to avoid "forcing a lender to extend new cash or new credit to a trustee or his assignee through the assumption of a pre-petition financial agreement." *In re Teligent, Inc.*, 268 B.R. 723, 737 (Bankr. S.D.N.Y. 2001) (emphasis omitted). And that is precisely what the Trustee endeavors to do here.

13

Bankruptcy Court to consider "the other affirmative defenses and . . . counterclaims" that it referenced in its decision.  See Docket Item 6-3 at 8.

SO ORDERED.

Dated: July 11, 2017
Buffalo, New York

*s/Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE